UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BARBARA J. MACDONALD,

Plaintiff,

v.                                          CASE NO.  8:12-CV-2473-T-17TBM

ANTHEM LIFE INSURANCE
COMPANY,

Defendant.

_____/

ORDER

This cause is before the Court on:

Dkt. 35    Motion for Summary Judgment (Defendant)
Dkt. 36    Statement of Undisputed Facts
Dkt. 39    Motion for Summary Judgment (Plaintiff)
Dkt. 40    Statement of Undisputed Facts
Dkt. 41    Response
Dkt. 42    Notice
Dkt. 47    Response
Dkt. 49    Sealed Notice of Exhibit

In the Complaint, Plaintiff Barbara J. MacDonald seeks the payment of long term
disability benefits, reinstatement of all other benefits, including the waiver of premiums
as if benefits had never been terminated, the award of attorney's fees and costs, and
other appropriate relief.

Defendant Anthem Life Insurance Company ("Anthem") moves for entry of
summary judgment affirming the termination of Plaintiff's long term disability benefits at
the end of the 24-month "own occupation" period.   Defendant Anthem determined that
Plaintiff MacDonald was capable of performing other gainful occupations and no longer

Case No. 8:12-CV-2473-T-17TBM

met the Policy's definition of disability.  During the initial and appeal review, Plaintiff did not submit any proof of her inability to perform other gainful occupations; Defendant Anthem relied on current evidence of Plaintiff's functional capacity.

Plaintiff MacDonald moves for entry of summary judgment in favor of Plaintiff, on the basis that it was wrong and arbitrary and capricious for Defendant to have relied, in part, on the restrictions and limitations provided by Dr. Krost, but not to have conducted a new TSA (Transferable Skills Assessment) to determine whether the new restrictions would prevent Plaintiff from working at any gainful occupation.

Plaintiff MacDonald also contends that Defendant's decision was wrong and arbitrary and capricious because, in Defendant's denial letter, Defendant Anthem relied only on a portion of the limitations expressed by Dr. Krost, ignoring the restrictions and limitations most damaging to Defendant's position.  Dr. Krost completed a PCA (Physical Capacity Assessment) which included restrictions which would prevent Plaintiff from using her left hand for all work activities.  Dr. Krost's PCA indicates that Plaintiff could not use her left hand for any of the activities specified, and found that Plaintiff could not return to her own sedentary occupation.  Defendant ignored how Plaintiff's inability to use her left hand affected her ability to work at any level (sedentary or light) and the more extensive restrictions and limitations were never submitted for occupational review.

2

Case No. 8:12-CV-2473-T-17TBM

I. Standard of Review

A. Rule 56

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c).

> "The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The appropriate substantive law will guide the determination of which facts are material and which facts are...irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson, 477 U.S. at 248. But, "[i]f the evidence is merely colorable...or is not significantly probative...summary judgment may be granted." Id. at 249-50.

The Court notes the discussion in Curran v. Kemper Natl. Servs., Inc., 2005 WL 894840 *7 (11th Cir. 2005)(unpublished) and Crume v. Met. Life Ins. Co., 417 F.Supp.2d 1258 (M.D. Fla. 2006). While there may be unresolved factual issues evident in the administrative record, ....unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would.

3

Case No. 8:12-CV-2473-T-17TBM

<u>Pinto v. Aetna Life Ins. Co.</u>, 2011 WL 536443 (M.D. Fla. Feb. 15, 2011).  Conflicting
evidence on the question of disability alone cannot create an issue of fact precluding
summary judgment, since an administrator's decision that rejects certain evidence and
credits conflicting proof may be reasonable.  417 F.Supp.2d at 1273.

B.  ERISA

      In reviewing a plan administrator's benefits decision, the Court performs the
following analysis:

> (1) Apply the <u>de novo</u> standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the court disagrees
> with the administrator's decision); if it is not, then end the inquiry and
> affirm the decision.
>
> (2) If the administrator's decision in fact is "<u>de novo</u> wrong," then
> determine whether he was vested with discretion in reviewing claims; if
> not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "<u>de novo</u> wrong" and he was vested
> with discretion in reviewing claims, then determine whether "reasonable"
> grounds supported it (hence, review his decision under the more
> deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the
> administrator's decision; if reasonable grounds do exist, then determine if
> he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court
> to take into account when determining whether an administrator's decision
> was arbitrary and capricious.

<u>See</u> <u>Blankenship v. Met. Life Ins. Co.</u>, 644 F.3d 1350, 1354 (11th Cir. 2011)(citing
<u>Capone v. Aetna Life Ins. Co.</u>, 592 F.3d 1189, 1195 (11th Cir. 2010)).

Case No. 8:12-CV-2473-T-17TBM

The Court's review of an ERISA benefits decision is "limited to consideration of the material available to the administrator at the time it made its decision."  Blankenship v. Met. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011)(citing Jett v. Blue Cross and Blue Shield of Alabama, Inc., 890 F.2d 1137, 1140 (11th Cir. 1989).

**Statement of Facts**

1. Plaintiff Barbara J. MacDonald was  employed by Wellpoint, Inc. as a medical claims processor  commencing on September 4, 2007.  Plaintiff's last day worked was May 23, 2009.

2. Plaintiff MacDonald was a participant in an employee welfare benefit plan sponsored by Wellpoint, Inc., which included Wellpoint Group Long Term Disability Plan.

3. The Wellpoint Group Long Term Disability Plan is governed by ERISA.

4. Wellpoint Group Long Term Disability Plan is funded through policy of insurance issued by Anthem Life Insurance Company.

5. Anthem Life was the claim administrator and administered benefits under the terms of the Policy.

6. The Policy defines "Disability" as meaning, during the Elimination Period and the next 24 months because of Your injury or sickness, *all* of the following are true:

> You are unable to do the Material and Substantial duties of your Own Occupation; *and*

5

Case No. 8:12-CV-2473-T-17TBM

You are receiving Regular Care from a doctor for that injury or sickness; *and*
Your Disability Work Earnings, if any, are less than or equal to 80% of Your Indexed Pre-Disability Earnings.

7. After 24 months, "Disabled" and "Disability" mean because of Your injury and sickness all of the following are true:

You are unable to do the duties of any Gainful Occupation for which You are or may become reasonably qualified by education, training or experience; *and*
You are receiving Regular Care from a doctor for that injury or sickness; *and*
Your Disability Work Earnings, if any, are less than or equal to 80% of your Indexed Pre-Disability Earnings.

Your Disability must start while You are insured under the Policy.

Your loss of earnings must be a direct result of Your injury or sickness.......

8. The Policy defines "Injury" and "sickness":

Injury means a bodily injury that occurs while you are insured and is the direct result of an accident and not related to any other cause.

Sickness means an illness or disease. It also includes an injury which occurs before you are insured.

9. The Policy defines Regular Care:

Regular Care means:

you personally visit a doctor as often as is medically required to effectively manage and treat your disabling condition(s), according to generally accepted medical standards:
AND
you are receiving appropriate treatment and care, according to generally accepted medical standards. Treatment and care for the sickness or injury causing your disability must be given by a doctor whose specialty or experience is appropriate.

6

Case No. 8:12-CV-2473-T-17TBM

10.  The Policy provides that disability payments will stop on the earliest of the following dates:

......

[W]hen you have received 24 or more months of payments from us and you are able to:

1.  Work in a gainful occupation, part-time or full-time, but you do not do so;

2.  Increase your disability work earnings working full-time or part-time in any gainful occupation but you do not do so.

11. "Material and Substantial Duties" are duties that:

(1) Are normally required for the performance of your Own Occupation *or* any occupation; and
(2) Cannot be reasonably omitted or modified, except that We will consider You able to perform the Material and Substantial Duties if You are working or have the capability to work your normal scheduled work hours.

12.  The Policy defines "Own Occupation":

Own Occupation means the occupation that You regularly performed and for which You were covered under the Policy immediately prior to the date Your Disability began.  The occupation will be considered as it is generally performed in the national economy, and is not limited to the specific position You had with your employer.

13.   The Policy defines "Gainful Occupation":

Gainful Occupation means an occupation that is or can be expected to provide You with an income within 12 months of Your return to work (and before taxes), that is at least equal to your gross monthly payment.

7

Case No. 8:12-CV-2473-T-17TBM

    14.  The Policy defines "Disability Work Earnings":

Disability Work Earnings means for Long Term Disability benefits, monthly
earnings which You receive while You are Disabled and working, plus the
earnings You could receive if You were working to Your Maximum
Capacity.

Maximum Capacity means, based on Your restrictions and limitations:

1.      For the first 24 months of payments from us, the greatest
        extent of work You are able to do, and which is reasonably
        available, in Your Own Occupation.

2.      Following 24 months of payments from us, the greatest
        extent of work You are able to do in any Gainful Occupation
        for which You are reasonably qualified by education,
        training, or experience.

    15.  Plaintiff's salary was $2,028.22 per month and her gross monthly disability

payment was $1216.93, 60% of pre-disability earnings.  A "Gainful wage" is $14,603.00

per year.

    16.  The Policy limits benefit payments to 24 months for "disability due to mental

illness, substance abuse, or self-reported symptoms."

    17.  Under the Policy, Anthem Life is authorized to determine eligibility for

benefits.  The Policy states:

We have discretionary authority to determine your eligibility for benefits
and to construe the terms of the policy to make a benefits determination.

    18.  Plaintiff MacDonald had a motorcycle accident on May 23, 2009, in which

Plaintiff sustained injuries.  Plaintiff's first day of disability was May 26, 2009.

    19.  Wellpoint, Inc. approved Plaintiff's request for FMLA leave commencing on

May 23, 2009 and approved Plaintiff's application for salary continuation/STD benefits.

Case No. 8:12-CV-2473-T-17TBM

20. Plaintiff MacDonald saw Dr. Martha Aliwalas, Plaintiff's primary care physician, on May 26, 2009. Dr. Aliwalas certified Plaintiff was unable to work due to severity of pain, and multiple contusions and abrasions, as to Plaintiff's FMLA leave through June 30, 2009. Dr. Aliwalas prescribed physical therapy and pain medication. Plaintiff saw Dr. Michael Vella, Syracuse Orthopedic Specialists on June 10, 2009; Dr. Vella recommended a bone scan. Plaintiff had a bone scan on June 15, 2009, and saw Dr. Daniel Murphy, Syracuse Orthopedic Specialists, on June 16, 2009 for pain in her left shoulder and stiffness, swelling and pain in the hand.

21. The bone scan of June 15, 2009 showed increased activity in the left acromioclavicular joint (joint at top of shoulder). On June 19, 2009, after review of x-rays and an examination, Dr. Daniel Murphy found a Grade II AC separation in Plaintiff's shoulder, a contusion sprain of Plaintiff's left hand and "Plaintiff is developing an early RSD." Dr. Murphy recommended referral for evaluation for possible sympathetic block.

22. The APS of Dr. Aliwalas reflects treatment on July 24, 2009, August 14, 2009, and August 31, 2009 for left elbow, left wrist, and left shoulder pain evidenced by swelling, decreased range of motion and decreased strength. Dr. Aliwalas further certified Plaintiff as unable to work for July 24, 2009 through August 31, 2009 for FMLA leave.

23. On July 22, 2009, Plaintiff MacDonald saw Pain Management Consultant Dr. Rina Davis, New York Spine and Wellness Center, July 29, 2009, on referral from Dr. Murphy. Dr. Davis prescribed medication and recommended nerve blocks. Plaintiff had trigger point injections to left trapezius and posterior cervical paraspinals. Plaintiff was to continue physical therapy.

9

Case No. 8:12-CV-2473-T-17TBM

24. On July 30, 2009, Plaintiff scheduled an appointment with Dr. Kevin Setter, Upstate Medical University, State University of New York, for September 17, 2009. An NCV was scheduled for September 9, 2009.

25. On August 7, 2009, Plaintiff MacDonald submitted Plaintiff's Supplemental Disability Application.

26. On August 31, 2009, Dr. Aliwalas requested Plaintiff be excused from work from August 31, 2009 through September 30, 2009, and submitted a Supplemental Physician's Statement of Disability on September 6, 2009.

27. Plaintiff submitted a Supplemental Disability Application on August 31, 2009.

28. Plaintiff continued to receive STD, and was notified that Plaintiff would need to apply for LTD; Plaintiff submitted records from Dr. Aliwalas, Dr. Davis and Dr. Setter.

29. On September 17, 2009, Dr. Kevin Setter examined Plaintiff, and injected the left subacromial region with a mixture of Marcaine, lidocaine and Depo-Medrol. Dr. Setter's impression was Complex Regional Pain Syndrome, or a variant thereof; Dr. Setter also noted signs of impingement syndrome.

30. Nerve blocks were scheduled at New York Spine and Wellness Center on October 1, 2009, October 15, 2009, October 29,2009 and November 12, 2009.

31. Dr. Aliwalas requested that Plaintiff be excused from work from September 30, 2009 through December 31, 2009.

32. In a letter dated October 19, 2009, Anthem Life acknowledged a request for Long Term Disability benefits from Wellpoint on behalf of Plaintiff, and sent forms to

Case No. 8:12-CV-2473-T-17TBM

Plaintiff to complete and return by November 15, 2009.

33. On October 19, 2009, Dr. Aliwalas provided a letter which certified Plaintiff's temporary total disability due to injuries to bilateral upper extremities especially to the left shoulder:

> [Plaintiff's] job involves her sitting at a desk and continuously typing. This requires her to be in the same position for prolonged periods of time and using her arm and hands to process claims. Her left arm has a significant range of motion deficit, and she has severe pain and intermittent severe swelling in her left hand. Due to pain, inability to move and deficit in her fine motor skills, she is unable to perform these job duties. If she tries to type, she will experience pain, and in addition she is not capable to processing the reports with adequate speed or accuracy.
>
> Her current status is temporary total disability, and based on her progress, I will anticipate this status to remain for at least 6-12 months if not longer.

34. Plaintiff saw Dr. Kevin Setter on October 22, 2009. Dr. Setter noted continued pain and CRPS. Dr. Setter deferred to New York Spine and Wellness Center as to treatment of CRPS, and deferred any surgical intervention or injections until after Plaintiff's pain is under better control; Dr. Setter would see Plaintiff on a p.r.n. basis.

35. On October 28, 2009, Plaintiff saw Dr. Aliwalas for re-evaluation of her wrist pain, shoulder pain and elbow pain, and for treatment for depression, anxiety and panic related to the motorcycle accident. Dr. Aliwalas noted decreased grip strength, shiny skin, edema in hand and wrist, and skin discoloration in the fingers. Dr. Aliwalas prescribed Cymbalta.

36. Plaintiff's Claim for LTD benefits was approved on November 13, 2009. The notes of the claim approval state:

11

Case No. 8:12-CV-2473-T-17TBM

> Approval Summary: 51 yof claims processor oow since 5-26-2009 due to
> a motorcycle acct. Clmt did not fx anything but sustained soft tissue/nerve
> damage to left arm/shoulder/elbow/wrist/hand. Current dx is impingement
> syndrome/complex regional pain syndrome. Physical exam from 10-2009
> notes marked tenderness from left shoulder down to hand. Significant
> hand swelling with glossy appearance. Clmt. has tried nerve blocks but
> w/little improvement. Surgery is not suggested or epi injections until pain
> is better controlled. Clmt's occ is a claim processor which requires
> freq/constant keying with both hands. Suggest approval and f/u in 2 mths
> for medical status.

37. Plaintiff applied for Social Security Disability benefits on November 24, 2009.

38. The LTD Policy includes an 180 day elimination period. LTD Benefits began November 22, 2009, and terminated on November 21, 2011.

39. Dr. Setter submitted an APS dated November 18, 2009, noting that Plaintiff was being treated for continued pain, CRPS, by the New York Spine and Wellness Center.

40. Dr. Aliwalas saw Plaintiff on November 30, 2009 and on January 4, 2010, for depression/anxiety/pain and complex regional pain syndrome.

41. On February 13, 2010, Plaintiff's application for Social Security Disability Benefits was approved, and Plaintiff was determined to be entitled to benefits starting on November 1, 2009.

42. On March 1, 2010, Anthem acknowledged receipt of the Social Security Disability Income Award, and requested a refund of the overpayment of $2,361.00.

43. On February 10, 2010, Plaintiff was evaluated by Dr. Kevin Barrett, Mayo Clinic, for the Chiari malformation. Dr. Barrett referred Plaintiff for an MRI, for a pain

12

Case No. 8:12-CV-2473-T-17TBM

medicine consultation, and for a consultation with Dr. William Cheshire.

44. On February 10, 2010, Plaintiff was evaluated by Dr. Scott Palmer at the Mayo Clinic for a pain consultation. Dr. Palmer's report states:

PHYSICAL EXAMINATION

The patient was aware, alert and fully oriented in no acute distress. Speech was clear and coherent with no signs of sedation. The patient wore a long-sleeved shirt covering the left arm. She exhibited some mild edema with shininess of skin in the left hand and a somewhat sausage appearance to the digits of that hand. She had some subtle mottling over the forearm which was mildly increased as compared to the right. The left hand was cooler than the right. She did exhibit some pigmented hair around the left elbow that did appear asymmetric from the right side. The patient had at least antigravity strength throughout the left upper extremity. However, she had significant guarding that made it difficult to determine if she had any mild motor deficits. She exhibited allodynia to palpation really throughout the left upper extremity. She was able to elevate her arm at the shoulder to horizontal but she had increased pain trying to go above that. Otherwise, motor function was intact throughout. Sensation was intact to light touch throughout. Gait was normal.

Dr. Palmer provided a topical compounded cream for pain in the left upper extremity, a prescription for amitryptiline, ordered consultation with Dr. Sletten, Pain Psychology, and consultation with Physical Medicine and Rehabilitation.

45. Plaintiff had an MRI of the cervical spine at the Mayo Clinic on February 17, 2010, and a neurology consultation with Dr. William Cheshire, Mayo Clinic, on February 25, 2010. The MRI report states:

No significant interval change. Postoperative change lower cervical spine, including C6-C7 ACDF. Artifact associated with surgical hardware limits evaluation o the lower cervical region. Inferior cerebellar tonsillar ectopia (Chiari 1 malformation), more marked on the right. Please refer to

Case No. 8:12-CV-2473-T-17TBM

> report of today's MCJ MR examination of the brain for
> further evaluation. No syrinx within the cervical or upper
> thoracic spinal cord; current field-of-view extends to inferior
> T5 level. Mild upper cervical spondylosis, including mild
> narrowing of the right C3-C4 and C4-C5 neuroforamina by
> combination of facet arthropathy, uncovertebral disease and
> right posterolateral osteophyte. No significant central spinal
> stenosis or cord compression.

46. The report of Dr. Cheshire states:

HISTORY OF PRESENT ILLNESS

......Ever since the accident she has continued to have swelling throughout
the left upper extremity without evidence of venous obstruction.
Additionally, she has severe constant pain throughout the left arm as well
as involving the lateral neck and shoulder regions, with pain maximal in
the elbow and wrist. The quality of pain is burning, aching and stabbing
and she will awaken due to muscle spasms in the arm. She is unable to
grasp with the left hand or lift the arm mainly due to pain. All of the arm is
exquisitely sensitive to touch, especially contact with clothing or contact
with cold objects. Her arm becomes purple or blotchy and is alternately
hot or cold. There has been no unusual sweating. She has noted some
change in hair growth at the elbow.

Over time the intensity and location of pain have not substantially
changed. No medication has helped until recently, the topical preparation
given to her buy Dr. Palmer has been very helpful, containing
amitriptyline, gabapentin, lidocaine and ketamine. Previously she has
undergone a series of stellate and perhaps other blocks, and had tried a
TENS unit, hydrocodone, oxycodone, duloxetine, pregabalin, clonidine
and amitriptyline......


NEUROLOGIC EXAMINATION SUMMARY

Comprehensive neurologic examination findings are detailed on the
neurology examination sheet. Pertinent findings include: Intact upper
extremity reflexes, and no evidence of Horner syndrome. Moderately
severe mechanical allodynia as diagrammed encompassing left C3-T4
dermatomes along with absence of sensibility a pinprick or coldness in the
same territory. Strength, at least initially, appears normal in most major
muscle groups in the left upper extremity except for muscles of the hand

Case No. 8:12-CV-2473-T-17TBM

      which are more difficult to evaluate due to pain.  The left arm is cooler to
      touch, slightly pale, but there is no abnormal sweating.  The patient
      guards and is not use (sic) her left arm.  There is mild dependent edema
      in the left arm.

      REVIEW OF DATA:

      3-phase bone scan is normal without reflex sympathetic dystrophy
      changes in the left upper extremity.

      ......

      IMPRESSION:

      1.  Left brachial plexus stretch injury May 2009 complicated by ongoing
      dyesthetic neuropathic pain.  Associated vasomotor changes are
      consistent with complex regional pain syndrome.  It may be concluded
      that the cervical nerve roots are structurally continuous i.e. the patient did
      not sustain a cervical root avulsion, since her deep tendon reflexes today
      and outside nerve conduction studies and somatosensory evoked
      potentials were intact.

      2.  Symptomatic Chiari one malformation with exertional headaches.......

      RECOMMENDATIONS:

      The patient is appropriately scheduled for decompression of her Chiari
      one malformation.  It is uncertain whether the procedure will improve her
      left arm pain.  I recommend she continue with the compounded
      preparation prescribed by Scott Palmer, M.D. and discussed the further
      option of a trial of a cervical spinal cord stimulator should her pain persist
      postoperatively.  I have added vitamin B12 level to her schedules
      laboratory draw in March.  She is scheduled for followup with Dr. Barrett.

      47.  Surgery to correct the Chiari one malformation was performed on March 16,
2010 at the Mayo Clinic.

      48.  Dr. Aliwalas submitted an APS dated April 9, 2010, which stated that Plaintiff
is unable to work due to constant pain from June 16, 2009 onward; the APS states that

15